## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

### Case No. 1:17-CV-20018-GAYLES/TURNOFF

**DAVID JIA,**

      **Plaintiff,**

**v.**

**UNIVERSITY OF MIAMI, a not-for-profit
Corporation; ANGELA CAMERON;
KATHERINE WESTAWAY, in her official
and individual capacities; and WILLIAM
ANTHONY LAKE, in his official and individual
capacities,**

      **Defendants.**

_____/

## PLAINTIFFS' DAVID JIA'S OPPOSITION TO DEFENDANT, UNIVERSITY OF MIAMI THIRD MOTION TO DISMISS AMENDED COMPLAINT

      COMES NOW, the Plaintiff, DAVID JIA ("Jia"), by and through their undersigned counsel hereby submits this memorandum of law in opposition to the Defendant, UNIVERSITY OF MIAMI ("University") Fed. R. Civ. P. 12(b)(6) Second Motion to Dismiss Third Amended Complaint[1] ("Motion to Dismiss"). In support of said response the Plaintiff hereby state as follows:

### INTRODUCTION

      The third amended complaint was drafted in accordance with the Court's direction at the last hearing on defendants second motion to dismiss and with several cases on point the Plaintiff has met his burden of the pleading standard for purposes of a motion to dismiss. The incorporation of 150 allegations into every count and the inclusion of many exhibits does not amount to a shot gun complaint. The Plaintiff argued in its last response to Westaway's Supplemental Second Motion to Dismiss against the

---

[1] As a result of clerical error, the Plaintiff erroneously title its pleading "Plaintiff Third Amended Complaint" when in fact it is Defendants Third Motion to Dismiss and Plaintiff's Second Amended Complaint.

allegation of a shot gun complaint.  Interestingly, the Defendant, University raises this issue of shot gun complaint for the first time.  The Plaintiff's re-alleging of paragraph 12-165 (general allegations) at the beginning of each count is not a shotgun pleading. *Weiland v. Palm Beach County Sheriff's Office*, 792 F.3d 1313, 2015 U.S. App. LEXIS 11750, 92 Fed. R. Serv. 3d (Callaghan) 378, 25 Fla. L. Weekly Fed. C 1366.   Again, the Defendants attempt to paint the Plaintiff's factual allegations as long, salacious, intentionally sensational, and demonstrably false.  These headlines are better suited for the trier of fact.   These allegations read more of tragic failure of a University's obligations to protect its students and treat them fairly and without bias. It's not uncommon for Complaints of this nature to exceed 100 pages, for Defendants to file a Motion to Dismiss and for the Court to Deny such Motion to Dismiss.  *See Monic Ainhorn Morrison v. University Miami et. al*., Case No. 1:15-cv-23856; See also Omnibus Order on Motion to Dismiss *Id*. at (R-47).   UNIVERSITY, through an inconspicuous mention in foot note 2, *Pouyeh v. Bascom Palmer Eye Inst.*, 613 Fed. Appx 802, 808 (11th Cir. 2015) disingenuously leads this Court to believe it can review an entire exhibit not included in the Third Amended Complaint (the entire student handbook) to argue their case.  Defendant is attempting to argue for Summary Judgment in a Motion to Dismiss. A judge generally may not consider materials outside of the four corners of a complaint without first converting the motion to dismiss into a motion for summary judgment. *Day v. Taylor*, 400 F.3d 1272, 1275-76 (11th Cir. 2005).  The Court should disregard or strike all of the Defendants arguments involving the entire student handbook and the investigative report not included in the Plaintiff's Complaint. UNIVERSITY attempts to argue Summary Judgment issue in foot note 5, where they point out inaccuracies in the Plaintiffs' facts.  Unless, this Court converts this Motion to Dismiss to a Summary Judgment those argument should be disregarded or stricken from the record.  The Defendant fancifully attaches a self-serving investigate report not a part of the Plaintiff's Complaint by asserting the Court may consider these attachments because the Plaintiff referenced his internal Title IX investigation in the complaint. Court's decline to consider exhibits outside the Plaintiff's complaint if the Plaintiff does not refer to certain documents in the complaint.  *Franza v. Royal Caribbean Cruises, Ltd.*, 772 F.3d 1225, 2014 U.S. App. LEXIS 21375, 2014 AMC 2710, 25 Fla. L. Weekly

Fed. C 591.   The Plaintiff refers to the investigation conducted by Lake but does specifically refer the investigative report as such this report should be disregarded or stricken from the record. Defendant cannot manipulate case law in order to argue a Summary Judgment at a Motion to Dismiss stage.

Defendant's attempts to cherry pick facts ("relevant") in arguing their Motion to Dismiss, creates exhibits to attach to its Motion to Dismiss in order to avoid a Motion for Summary Judgment and manipulate case law to argue a Summary Judgment at a Motion to Dismiss stage. Many of the defendant's arguments are, at their core, disguised attempts to argue the merits of the case, which is improper at this stage of the proceedings and their tactics are questionable. The remaining arguments lack sufficient support in law and fact. The Plaintiff will argue herein that accepting all factual allegations of the plaintiff as true, construing the allegations in the light most favorable to the Plaintiff, the Plaintiff has satisfied his obligation of pleading a basis for relief on all counts that is not speculative. Therefore, Defendants Motion to Dismiss should be denied.

<u>**STANDARD ON A MOTION TO DISMISS**</u>

The threshold for surviving a motion to dismiss for failure to state a claim under Federal Rules of Civil Procedure 12(b)(6) is a low one. *Connors v. Orlando Regional Healthcare System, Inc.*, 2009 WL 2524568, at 1 (M.D. Fla. 2009). The Court should accept the factual allegations of the plaintiff's complaint as true, construe the allegations in the light most favorable to the plaintiff, and view the allegations to determine whether the plaintiff has satisfied his obligation of pleading a basis of relief that is not speculative. *Id.*, *citing Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).   A plaintiff is required to allege "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.*

The relevant question for a district court in assessing plausibility is whether "the complaint warrant[s] dismissal because it failed in toto to render plaintiffs' entitlement to relief plausible." *Twombly*, 550 U.S. 544, 569 n. 14 (2008). *See Braden v. Wal–Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir.2009) (explaining that "the complaint should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible"); *Ocasio Hernandez v. Fortuno-Burset*, 640 F.3d 1, 14-15 (1st Cir. 2011). Further, a Court is to consider a motion to dismiss in terms of the plaintiff's actual

pleadings, and not in terms of a defendant's Case 1:17-cv-200018-DPG Document 127 Filed 03/12/2018 Page 3 to 8 of 22 selective characterization of the facts. *See Armstrong Pharm., Inc. v. Micron Technologies, Inc.*, No. CIV. A 09-11197-RWZ, 2010 WL 745057, at *2 (D. Mass. 2010); *Hudson v. Dr. Michael J. O'Connell's Pain Care Ctr., Inc.*, 822 F. Supp. 2d 84, 93 (D.N.H. 2011). Accepting all factual allegations in the Amended Complaint as true, JIA has certainly pleaded facts sufficient to establish plausible claims for relief under federal and state law.

## ARGUMENT

### I.   THE COMPLAINT IS NOT A SHOTGUN PLEADING

The Plaintiff's re-alleging of paragraph 12-165 (general allegations) at the beginning of each count is not a shotgun pleading. *Weiland v. Palm Beach County Sheriff's Office*, 792 F.3d 1313, 2015 U.S. App. LEXIS 11750, 92 Fed. R. Serv. 3d (Callaghan) 378, 25 Fla. L. Weekly Fed. C 1366.    The Court has condemned the incorporation of preceding paragraphs where a complaint "contains several counts, predecessors [i.e., predecessor counts], leading to a situation where most of the counts (i.e., all but the first) contain irrelevant factual allegations and legal conclusions." *Strategic Income Fund,* 305 F.3d at 1295; *see also Magluta v. Samples*, 256 F.3d 1282, 1284 (11th Cir. 2001) (identifying a complaint as a shotgun pleading where "[e]ach count incorporates by reference the allegations made in a section entitled 'General Factual Allegations' — which comprise[d] 146 numbered paragraphs — while also incorporating the allegations of any count or counts that precede[d] it."). What we have here in this case and the *Weiland* case is different. The allegations of each count are not rolled into every successive count on down the line.  Thus, the subject complaint is not a shotgun pleading.

More importantly, this is not a situation where a failure to more precisely parcel out and identify the fact relevant to each claim materially increased the burden of understanding the factual allegations underlying each count, otherwise the defendant did not move for a more definite statement under the Federal Rules of Civil Procedure 12(e). *Id.* at 1325.  The Plaintiff, in additional to the re-alleging of the general allegations, bolstered its allegations in each count by alleging specific facts relevant to each allegation which the Plaintiff will address below.  *Johnson Enters. of Jacksonville v. Fpl*

*Group*, 162 F.3d 1290, 1998 U.S. App. LEXIS 31647, 37 U.C.C. Rep. Serv. 2d (Callaghan) 244

## II.  PLAINTIFF HAS STATED A CAUSE OF ACTION FOR BREACH OF CONTRACT AGAINST THE UNIVERSITY

Remarkably, the Defendant took no issue with the Plaintiff's Breach of Contract cause of action in its last Motion to Dismiss.  Now the Defendant seeks to dismiss this cause of action by attempting to admit the entire University School Handbook and argue that the Defendant complied fully with all duties set forth in the Handbook (the operative contract).

No doubt that student-university relationship is contractual in nature and that the terms of the contract may be derived **not only** from student handbook, but catalog, or other statement of university policy. *See, e.g. Ross v. Creighton Univ.*, 957 F.2d 410 (7th Cir. 1992); *Doherty v. Southern College of Optometry*, 862 F.2d 570 (6th Cir. 1988); *Corso v. Creighton Univ.*, 731 F.2d 529 (8th Cir. 1984); *Mahavongsanan v. Hall*, 529 F.2d 448 (5th Cir. 1976); *Abbariao v. Hamline Univ. Sch. of Law*, 258 N.W.2d 108 (Minn. 1977); *Bleicher v. University of Cincinnati College of Med.*, 78 Ohio App. 3d 302, 604 N.E.2d 783 (Ohio Ct. App. 1992); *University of Texas Health Science Ctr. at Houston v. Babb*, 646 S.W.2d 502 (Tex. Ct. App. 1982).

Plaintiff's Title IX claim factually overlap with his breach of contract and/or tort claims based on the University's failure to comply with university polices.  Court often reject attempts to dismiss these claims. See e.g. *Doe v. Brandeis.*, No. 15-11557, 2016 U.S. Dist. Lexis 43499, (d. Mass. Mar. 31, 2016); *Doe v. Middlebury Coll.*, No. 1:15-cv-192, 2015 U.S. Dist. Lexis 124540 (D. Vt. Sept. 16, 2015).  The Court in *Bradeis* noted a university's:

> "Authority to discipline its students is not entirely without limits… the university's disciplinary actions may be reviewed by the courts to determine whether it provided 'basic fairness' to the student.  While that concept is not well-defined, and no doubt varies with the magnitude of interests at stake, it is nonetheless clear that the university must provide its

students with some minimum level of fair play.  *Brandeis Univ.,* 2016 U.S. Dist. Lexis 43499.

The Plaintiff alleges UNIVERSITY's sexual assault policies attempt to redefine rape by proposing social rules on the conditions that might not constitute consent. Minority age, mental capacity, force restraint or unconsciousness, are valid grounds for charging students with sexual assault/battery (rape). UNIVERSITY appropriately prohibits these behaviors in their policies, but it doesn't stop there. Instead, UNIVERSITY attempts to redefine rape (and other sexual misconduct) as "consent" outside the commonly understood social norms. ¶ 116 UNIVERSITY's attempt to redefine rape (and sexual misconduct) as sex after drinking alcohol, is overly broad, nonsensical, and unenforceable in a college environment.  Rape is not synonymous with diminished capacity when consenting to sex. ¶ 117 Because university administrators believed that CAMERON was influenced to some degree by alcohol when she solicited sex from JIA, they found him responsible for her behavior. No UNIVERSITY policy addresses the sobriety level of the person requesting sex.  The UNIVERSITY policies only address the sobriety of the person giving the consent.  In this case the consenting party is JIA, not CAMERON.  Its not possible for people who ask their partners for sex can claim that they not consent to the sex they requested.  ¶ 119 Upon information and belief, the UNIVERSITY has never absolved a male student of sexual misconduct because he pleaded diminished capacity.  Yet, UNIVERSITY claimed that CAMERON cannot be held accountable for initiating sex because of what she reported as diminished capacity.  This double standard treats women and men differently.  ¶ 120   Upon information and belief, the UNIVERSITY has never found a female student in violation of sexual misconduct for failure to obtain consent from a male who was intoxicated. ¶ 121 UNIVERSITY demonstrated gender bias by assuming that JIA needed to gain CAMERON's consent for sex despite evidence showing that she is one who asked to have sex.  The credibility of CAMERON's complaint and motivation was not a close call, it was strikingly obvious.  Yet UNIVERSITY immediately assumed that as a male, JIA was the person that controlled the sexual engagement. ¶ 123 For the UNIVERSITY to assume that women do not initiate sexual intercourse, cannot be the sexual aggressors

6

during intercourse, and that men must therefore seek the permission of women even when women initiate sex, shows unequal treatment and gender bias. ¶ 124 By infantilizing women and ignoring that both men and women can initiate and agree to sex, UNIVERSITY is treating men and women unequally.  This gender bias is evident in the UNIVERSITY's policies, the application of those policies in student conduct hearing for sexual misconduct and in the "rape culture" programs it supports. ¶ 125 UNIVERSITY was aware of how JIA was being castigated by WESTAWAY and CAMERON. They knew how unfair and untrue the stories were how this information was being used to not only destroy JIA's life, but also harm the chances of men accused of sexual assault or rape, innocent or not, from having impartial adjudication of those charges and a fair outcome.  Nevertheless, UNIVERSITY stood by and took no action to correct these injustices.  They allowed the mischaracterization of JIA that fed the narrative that males are sexual predators. ¶ 127 The policy provision for a one-person panel and not three is flawed and violation of due process by allowing one potentially bias person to determine the violations of UNIVERSITY policy. ¶ 88

*Brandeis* manifests a court' willingness to look behind the curtains of university policies to determine if the university's adjudication of sexual misconduct allegations are implemented with fairness towards the accused.

This Court must do the same, its not bound by the UNIVERSITY's attempt to compartmentalize the breach of the contract to the Student Handbook, but this Court must be willing to look behind the curtains of the UNIVERSITY's policies.  This practice is supported by the First Circuits *Cloud* decision which determined school disciplinary hearings must be "conducted with the basic fairness." *Cloud v. Trustees of Boston Univ.,* 720 F. 2d 721, 725 (1st Cir. 1983).

In order for a breach of contract claim to survive a Fed. R. Civ. P. 12(b)(6) motion, a plaintiff in a case must plead the elements of a breach of contract as established by the applicable state's laws, in this case Florida law.  *Merrill Lynch Bus. Fin. Servs. v. Performance Mach. Sys. U.S.A.*, 2005 U.S. Dist. LEXIS 7309, 18 Fla. L. Weekly Fed. D 489. The elements of a breach of contract action are: (1) a valid contract; (2) a material breach; and (3) damages." *Schiffman v. Schiffman*, 47 So. 3d 925, 927 (Fla.

3d DCA 2010) (quoting *Abbott Labs., Inc. v. Gen. Elec. Capital*, 765 So. 2d 737, 740 (Fla. 5th DCA 2000)).

The Plaintiff alleges in its complaint the University had a contractual duty to the Plaintiff as set out in the Student Rights & Responsibilities Handbook.  Students have the right to (1) be treated equally in academic and social settings, (2) the right to live and/or attend classes in a physically safe environment, (3) the right to express diverse opinions in an intellectually safe environment, (4) the right to privacy, (5) the expectation of a positive living/learning environment, amongst others.

The Plaintiff alleges that the University breached express and/or implied agreements with Jia and damages.  The Plaintiff realleges and incorporates the aforementioned allegations. This is all that is required under Florida law.

The Plaintiff's re-alleging of paragraph 12-165 in its breach of contract action (general allegations) at the beginning of the count is enough to put the Defendant of notice of the cause of action. The allegations in paragraph 12 to 34 are necessary to show the various pressures on the University Administrators, Dean Lake and Dean Preiepke. Allegations 35 to 46 are necessary to show the nature of the actions and the actors involved in their official capacity as employees.  The allegations in paragraph 47 – 166 shows how Jia was treated unfairly and with bias through the title IX investigation, hearing, after the hearing, up to and after his graduation day.  The allegations show how the UNIVERSITY did nothing to protect JIA when he was being called a rapist and a batterer, how he was railroaded with little testimony against him and two witnesses in his defense.  Because UNIVERSITY's alleges it complied with the Student Handbook doesn't mean its policies and the application of those policies are unfair or bias to JIA.  It is up to this Court to pull back the curtain of the Universities policy to determine if the university's adjudication of sexual misconduct allegations is implemented with fairness towards JIA.

III.     **COUNT II STATES A CAUSE OF ACTION FOR VIOLATION OF TITLE IX AGAINST THE UNIVERSITY**

UNIVERSITY argues the Plaintiff has failed to plead any facts to support the element that the UNIVERSITY receives federal assistance and that its insufficient to

allege, *upon information and belief*, that the UNIVERSITY receives federal funding. To be clear, the Plaintiff alleges "*Upon information and belief*, UNIVERSITY receives federal funding in the form of federal grants from numerous federal sources, including, without limitation, Department of Education, Environmental Protection Agency, National Endowment for the Arts and National Science Foundation."

It is well-settled that "[p]leading 'upon information and belief' is **sufficient** to satisfy federal notice pleading under Fed.R.Civ.P. 8(a)." *Elektra Enter. Group v. Santangelo*, 2005 U.S. Dist. LEXIS 30388, at *7 (S.D.N.Y. Nov. 28, 2005), quoting *Steinbrecher v. Oswego Police Officer Dickey*, 138 F.Supp.2d 1103, 1109-1110 (N.D. Ill. 2001).

In opposition, the Defendant asserts that alleging *upon information and belief* in a Title IX context in not sufficient. *Burch v. Young Harris Coll.*, No 2:13-CV-WCO, 2013 WL 11319423, at 6 (N.D. Ga. Oct. 9, 2013). In *Burch*, the Court focused on the general allegations of constructive notice. The Plaintiff in that case did not allege any time at which defendant was put on notice of the alleged widespread hazing prior to a report. The Plaintiff's assertion that "it is hard to imagine that….some appropriate person would not be aware" of such widespread hazing was not sufficient. *Id.* at 19. In the present case, the Plaintiff fulfilled his burden of pleading by Alleging "upon information and belief UNIVERSITY receives federal funding in the form of federal grants from numerous federal sources, including, without limitation, Department of Education, Environmental Protection Agency, National Endowment for the Arts and National Science Foundation." *See Grant Neal v. Colorado State University-Pueblo*, et al. Case 1:16-cv-00873-RM-CBS Document 87 (U.S.D.C. Colo. Sept 11, 2017) (Where the Plaintiff's complaint alleging "upon information and belief" survived motion to dismiss)

Moreover, a plaintiff suing Brown University defeated a motion to dismiss Title IX claims by alleging, "upon information and belief" *Doe v. Brown Univ.*, No 15-144, 2016 US. Dist. Lexis 21027, 27 (D.R.I Feb 22, 2016). It should be noted *Brown* is **not alone** in finding male Title IX plaintiffs can establish gender-bias via "information and belief" allegations. Four district courts in *Salisbury*, *Prasad* and *Ritter* cited "information and belief" allegations as a basis for rejecting motions to dismiss Title IX claims. *See eg.,*

9

*Doe v. Salisbury University*, Civil No. JKB-15-517, 2015 U.S. Dist. LEXIS 110772, 41 (Aug. 21, 2015) (finding alleging gender-bias "based solely 'upon information and belief,' is a permissible…..even after Twombly and Iqbal decisions…."); *Prasad v. Cornell Univ., U.S. Dist. Court of N. Dist. Of N.Y.*, No. 5:15-cv-322 ( Feb. 24, 2016) which rejected a motion to dismiss a Title IX claim filed by a male student which was based in part on "information and belief" allegations); *Ritter v. Oklahoma*, no.16-0438 (U.S. W.D. Ok May 6, 2016) (which granted a temporary restraining order in part because plaintiff established Title IX claims based on "information and belief" allegations).

The Plaintiff's "gravamen" of is complaint **goes well beyond** allegation based on pressure from the government, a flawed or irregular investigation and the fact that the Plaintiff is male. The Defendant, citing to the pleading standards of Twombly and Iqbal, contend that Jia's Title IX claim must fail because procedural missteps that happen to disadvantage a male student in favor of a female student do not, standing alone, support the plausible inference that those missteps occurred because of the accused students gender. *Doe v. Lynn Univ. Inc.*, 224 F. Supp. 3d 1288, 1290 (S.D. Fla. 2016) See Defendants' Motion to Dismiss Plaintiff's Amended Complaint, at 15 ("Motion to Dismiss"). Critical examination of the allegations as a whole and controlling Title IX standards lead unequivocally to the contrary conclusion, that the Amended Complaint does sufficiently state a Title IX claim.

### A. The Controlling Title IX Standard.

Title IX bars the imposition of university discipline where gender is a motivating factor in the decision. In *Yusuf v. Vassar College*, 35 F.3d at 715, the Second Circuit held that a plaintiff's challenge to a university disciplinary proceeding on grounds of gender bias will generally fall within two categories. Under the first category, the claim is that there is an "erroneous outcome" in plaintiff being found to have committed an offense and disciplined. *Id.* Under the second category, the plaintiff alleges "selective enforcement" in terms of selective initiation or severity of penalty. *Id.* Concerning a claim under the "erroneous outcome" category, the *Yusuf* court specified "the pleading burden in this regard is not heavy. For example, a complaint may allege particular evidentiary weaknesses behind the finding of an offense such as a motive to lie on the

part of a complainant or witnesses, particularized strengths of the defense, or other reason to doubt the veracity of the charge. A complaint may also allege particular procedural flaws affecting the proof." *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994). The Yusuf standard remains the controlling legal standard for a gender bias claim brought under Title IX. *See Wells v. Xavier Univ.*, 7 F. Supp. 3d 746 (S.D. Ohio 2014); *Williams v. Franklin & Marshall College,* 2000 WL 62316 at 2 (E.D. Pa. 2000); *Doe v. Salisbury*, 123 F. Supp. 3d 748 (D. Md. 2015).

Since Title IX was modeled after Title VI and VII of the Civil Rights Act of 1964, courts have frequently applied Title VII's framework and principles to Title IX claims. See *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 n. 1 (2d Cir. 2000); *Murray v. N.Y. Univ. Coll. Of Dentistry*, 57 F.3d 243, 248-49 (2d Cir. 1995) (stating Title VII standards should be applied in determining a university's liability for a student's claim of sexual harassment under Title IX). For instance, because evidence of discrimination would most likely be within the defendants' sole possession and control at the pleading stage, allegations made upon information and belief are sufficient to withstand a motion to dismiss. See *Grajales v. P.R.Ports Auth.,* 682 F.3d 40, 49 (1st Cir.2012) ("'[s]moking gun' proof of discrimination is rarely available ... at the pleading stage"); *Menard v. CSX Transp., Inc.,* 698 F.3d 40, 44 (1st Cir. 2012) ("information and belief" is appropriate in pleadings, does not mean pure speculation).

First, the Defendants seem to, erroneously, contend that this Court should disregard the factual allegations in the Third Amended Complaint on the grounds that they are insufficiently particularized and thus should be treated as speculative and conclusory. Contrary to the Defendants' contentions, the 63-page Amended Complaint is quite particularized, but in any event, a Title IX plaintiff is not required to present "particularized facts" as required by a heightened pleading standard. See *Blank v. Knox Coll.*, No. 14-CV-1386, 2015 WL 328602 (C.D. Ill. 2015). It is generally accepted that, in the discrimination context, a court "cannot hold plaintiffs to a standard that would effectively require them, prediscovery, to plead evidence." *Cooperman v. Individual Inc.*, 171 F.3d 43, 48-9 (1st Cir. 1999)) *quoting Shaw v. Digital*, 82 F.3d 1194, 1225 (1st Cir.1996); *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 511 (2002) ("[w]hen a federal court reviews the sufficiency of a complaint…its task is necessarily a limited one. The

issue is **not** whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims").

Instead, a court must determine whether a claim has facial plausibility -- that is, "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Blank v. Knox Coll.*, No. 14-CV-1386, 2015 WL 328602, at 2 (C.D. Ill. 2015) Moreover, "Iqbal does not require that the inference of discriminatory intent supported by the pleaded facts be the most plausible explanation of the defendant's conduct." *Doe v. Columbia*, No. 15-1536, 2016 WL 4056034 at 8 (2d Cir. July 29, 2016). Adopting the legal principles from Title VII cases, Judge Leval clarified the pleading standards for a Title IX claim at the motion to dismiss stage in *Doe v. Columbia* as follows:

> "[a] complaint under Title IX, alleging that the plaintiff was subjected to discrimination on account of sex in the imposition of university discipline, is sufficient with respect to the element of discriminatory intent, like a complaint under Title VII, if it pleads specific facts that support a minimal plausible inference of such discrimination."

*Doe v. Columbia*, No. 15-1536, 2016 WL 4056034 at 4 (2d Cir. July 29, 2016). Judge Leval's decision follows the McDonnell-Douglas framework in which plaintiffs alleging employment discrimination in violation of Title VII need present only minimal evidence supporting an inference of discrimination in order to prevail. Extending this principle to the Title IX context, the Second Circuit noted: "[w]hen the evidence substantially favors one party's version of a disputed matter, but an evaluator forms a conclusion in favor of the other side…it is plausible to infer…that the evaluator has been influenced by bias." *Doe v. Columbia*, No. 15-1536, 2016 WL 4056034 at 8 (2d Cir. July 29, 2016). Interestingly, *Columbia* was subsequently overturned on appeal. *Doe v. Columbia Univ.*, 831 F.3d 46, 2016 U.S. App. LEXIS 13773. The 2nd Circuit of Appeals found  "A complaint under Title IX, alleging that plaintiff was subjected to discrimination on account of sex in the imposition of university discipline, was sufficient with respect to the element of discriminatory intent if it pled specific facts that supported a minimal plausible inference of such discrimination; student's complaint pled sufficient specific facts giving support to a plausible inference of sex discrimination to survive a motion to

dismiss, if Title IX's other requirements were met, because the complaint alleged that the university's hearing panel, its dean, and its Title IX investigator, were all motivated in their actions by pro-female, anti-male bias." JIA directly attributes the deficiencies in University's investigation process to his gender by demonstrating how a reasonable review of the evidence could **not** have led to a finding of responsibility.

Second, the Defendants fail to recognize that in *Twombly* and *Iqbal*, the Supreme Court does not just state general rules governing motions to dismiss and pronounce a complaint conclusory or not, but rather carefully applies those rules to the specifics of the claims and pleaded facts in a context specific analysis. There is no invitation to ignore pleaded facts.

**B. JIA's Sufficiently Pleads An Erroneous Outcome Claim.**

JIA's "erroneous outcome" claim of intentional sex discrimination arises from the totality of the circumstances. *Doe v. Washington and Lee University*, No. 6:14-cv-00052, 2015 WL 4647996 *10 (W.D. Va. Aug. 5, 2015) ("Given the totality of the circumstances, including the flaws in the proceedings and statements made by W&L officials, Plaintiff has plausibly established a causal link between his expulsion and gender bias").

Those circumstances include: (1) CAMERON was in a consensual sexual relationship with JIA, who sex with him the morning after the alleged incident and few more times after that, who brought him cookies after the alleged assault and only reported the alleged sexual assault a week later after he didn't invite her to a party he was having. (2) CAMERON provided no witnesses with first hand knowledge of the alleged assault. CAMERON did not contest the fact that she was the aggressor in asking for sex the night of the alleged assault. JIA provided witness statements, text messages, and other documentation to support his innocence (3) a biased, prosecutorial minded investigation that failed to keep the roles of prosecutor, witness, and judge separate as required by due process, *Tumey v. State of Ohio*, 273 U.S. 510, 534 (1927); (4) a badly flawed, Kafkaesque, railroading procedural process that resulted in the disregard of critical facts and exculpatory information which would have altered the finding against JIA as a male accused of misconduct, *Doe v. Washington and Lee University*, supra (procedural flaws reflecting a practice of railroading males supportive of Title IX "erroneous outcome"

13

case), *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242 (1980) (due process matters is so that cases are not decided "on the basis of an erroneous or distorted conception of the law or the facts"); (iv) the manipulation of the preponderance standard reflecting the failure to shave a burden of proof as required by due process, *Tumey v. State of Ohio*, *supra* (having a burden of proof is a requirement of due process); and (v) the broader context, atmosphere and general sentiment at the university concerning sexual misconduct allegations at the time of the relevant proceeding to infer a plausible bias against Plaintiff, *Doe v. Columbia*, No. 15-1536, 2016 WL 4056034 (2d Cir. July 29, 2016).

The allegations of the Amended Complaint set forth University's discriminatory conduct on the basis of JIA's male gender. A cause of action for an erroneous outcome case of intentional sex discrimination in violation of Title IX is pleaded:

The UNIVERSITY, upon pressure from governmental agencies such as OCR/DOE, took unlawful and gender biased disciplinary actions against JIA. Evidence of these unlawful and/or gender biased actions include, but is not limited to, the UNIVERSITY's pattern and practice of taking unlawful disciplinary actions against male students such as JIA, without allowing for constitutional due process as mandated by title IX. ¶ 15  Based on the information detailed in this Complaint (and) upon information and belief, UNIVERSITY's unlawful discipline of JIA occurred in part because of UNIVERSITY's biased assumptions that female students do not sexually assault their fellow male students.  Although, according to the University's student handbook, a student cannot consent if they are drunk, in this case both JIA and CAMERON admitted to being drunk.  According to their policy JIA and CAMERON either both violated the policy or the UNIVERSITY choose to go after JIA because he is a male. ¶16  In response to pressure from the DOE, the DOJ, and/or the White House, educational institutions including the UNIVERSITY are severely mishandling procedural protections afforded to students like JIA in sexual misconduct cases. ¶ 18 Similarly, the facts detailed in this Complaint prove the UNIVERSITY's Policies explicitly and/or implicitly incorporate and/or embrace the Association of Title IX Administrators (ATIXA) and National Center for Higher Education Risk Management (NCHERM) procedures, however they are misinterpreting the procedures causing gender bias and severely limiting the procedural protections that should be afforded male and female students alike in sexual misconduct

cases. ¶ 19 Upon Information and belief governmental pressure to find male students responsible for sexual misconduct has caused UNIVERSITY to enact a gender bias policy and procedure with a low standard of proof, gender bias definitions, a gender bias investigation mechanism, a discriminatory, gender bias conduct hearing and a flawed process in order to keep federal funding flowing. ¶ 22 Upon information and belief, after years of criticism for being too lax on campus sexual violence, UNIVERSITY is relying on Title IX to crack down on alleged perpetrators of sexual violence and sexual misconduct including JIA. In the process the UNIVERSITY is blatantly discriminating against men, including JIA. ¶ 27 WESTAWAY founded UNIVERSITY organization Canes Consent. She was a member of UNIVERSITY president Shalala's Coalition on Sexual Violence Prevention and Education. She taught multiple course in women's and gender studies, she was the program director of UNIVERSITY Women's Commission in 2013. She was UNIVERSITY's Women and Gender studies delegate at the women's leadership symposium in 2013.  She was the Gender Advisor during Diversity Week with UNIVERSITY's Office of Multicultural Student Affairs, In 2013 She was the Women and Gender Studies Consultant for "CONVERGE! The Movement to End Gender Violence" with UNIVERSITY School of Law, 2014.   Because she was so heavily involved with matters relating to gender discrimination and sexual assault at UNIVERSITY she should have been properly trained and supervised.  WESTAWAY was never trained by the UNIVERSITY or properly supervised, instead she was given free range to disseminate private and false information regarding JIA to his detriment. Even after WESTAWAY discovered CAMERON was lying, WESTAWAY pursued her crusade against JIA with even more vigor. ¶ 28 WESTAWAY with concerned faculty, sent a letter to President Shalala stating " We are calling for a renewed response from the administration to the information that has come to light about how the university is handling issues of sexual assault on campus." "A fair hearing for Angela Cameron, and assurance that there will not be fall out for any students, faculty, or staff who have supported her." "While the issue of sexual assault is seen by many university administrations as a possible PR threat, inaction is just as likely to damage a university's reputation." "Angela represents many other students who have not been able to come forward."   WESTAWAY was a catalyst of pressure on the UNIVERSITY to do

something regarding CAMERON'S alleged sexual assault. ¶ 29 UNIVERSITY policy, guidelines and regulations are set up to disproportionately affect the male student population of the UNIVERSITY community as a result of the higher incident of female complainants of sexual misconduct vs. male complaints of sexual misconduct. ¶ 32 UNIVERSITY policy, guidelines and regulations effectuate a failure of due process for the student population, especially the male student population, in their current state because they are set up to encourage and facilitate the reporting of false reports of sexual misconduct and/or other grievances without any recourse for the falsely accused. ¶ 33 Because of Pressure from the government, pressure from previous allegations of female students, pressure from the Office of Civil Rights, and pressure from WESTAWAY, the UNIVERSITY's Title IX department mishandled the investigation into JIA's case, intentionally prolonged the investigation, instituted a flawed process which lead to a contrived, gender bias, unfair hearing process against JIA.  ¶ 34 According to the UNIVERSITY's policy and procedure, Title IX complaints, subsequent hearings and all information obtained as a result are confidential. Any information obtained during an investigation or hearing shall not be discussed by any parties, and faculty outside the confines of the conduct hearing. The UNIVERSITY and its employees are prohibited from disclosing such information. ¶ 66 Upon information of belief, despite this confidentiality policy, CAMERON and WESTAWAY disclosed confidential information obtained during this hearing to further the goals to make JIA the face of the college rapist who got away with rape the UNIVERSITY failed to deal with by permanently expelling him.   JIA never consented to dissemination of his private information. ¶ 67 The University investigator for this alleged incident was LAKE.  It is the University's policy to have a non-biased investigator, but they failed to adhere to their policy by appointing LAKE, a faculty member under pressure for mishandling two other sexual assault allegations from women. ¶ 72 Furthermore, during one of the meetings with LAKE and JIA, LAKE loudly shouted to JIA that they needed to "be more compassionate" toward CAMERON.   ¶ 74 While in a meeting, LAKE tells JIA that it was JIA who was the one who had "caused the situation" without looking into JIA's account of the night or even attempting to find any evidence to corroborate any statements provided. This conduct directly shows his bias and disregard towards anything JIA had to say or any of the

evidence JIA presented. ¶75 JIA explained what happened to LAKE and asked to file a counter complaint against CAMERON because she initiate the sex and he too was intoxicated.  LAKE told JIA that they need to be compassionate to CAMERON.  LAKE incorrectly informed JIA that he could not file a complaint because it would be considered retaliation against CAMERON. ¶ 69 UNIVERSITY's use of this lowest standard possible to determine JIA violation of school policy is unreasonable and discriminatory. ¶70 On May 27, 2014 JIA emailed LAKE to request Stein to be invited to participate in person for the hearing on June 24, 2014. ¶79 On June 24, 2014 LAKE, failed to call Stein for hearing and instead called Gardell to be present for the June 24, 2014 hearing even though LAKE knew Gardell would not be available for the hearing. ¶ 80 CAMERON was permitted to present a telephonic witness (Sophia) who was not present the night of the alleged sexual misconduct and did not have firsthand knowledge. The University's Student Handbook which govern disciplinary hearings "For the purposes of a formal disciplinary hearing, 'witnesses' must be individuals who have firsthand knowledge of the incident in question and be able to speak to the facts of the case at hand."  UNIVERSITY would later justify the choice to allow Sophia to give her testimony by stating she had firsthand knowledge of Angela's "emotional reaction" a week after the alleged sexual misconduct.  UNIVERSITY would later justify the choice to allow Sophia to give her testimony by stating she had firsthand knowledge of Angela's "emotional reaction" a week after the alleged sexual misconduct. ¶ 81 Despite JIA'S written requests and submissions of his witnesses to be present, JIA never received from the UNIVERSITY a witness list of designated witnesses for the June 24, 2014 hearing. Had JIA received such list, he would have been able to note that the two individuals with direct knowledge of the allegations (Stein and Gardell) had been prevented from participating in the proceedings. ¶ 83 JIA requested a three-person panel for his June 24, 2014 hearing but only received a one-person panel, Dean Steve Priepke to make the decision on his responsibility of the alleged incident. LAKE was also present but sitting solely as the "non-biased" investigator of the incident, not part of the MDHP. ¶ 84 LAKE investigated the allegations and was responsible for presenting the case to one of his student affairs colleagues. LAKE delayed the student conduct hearing on the matter until June 24, 2014 when the University was not in regular session.  After the regular session

LAKE could justify the appointment of a one-person panel and not a three-person panel as requested. ¶ 86 LAKE's statements in Miami Hurricane contradict his own actions in JIA's conduct hearing "We as an institution have tried to build a system that is impartial," Lake said. "It wouldn't be appropriate for us to come into the issue as prosecutors against one student. As investigators, we gather evidence and present it to a hearing panel. The hearing panel is comprised of a minimum of three representatives. There is at least one person representing each the student, the faculty and the staff on campus." Further evidence supporting violation of due process, and gender discrimination against JIA. ¶87 The policy provision for a one-person panel and not three is flawed and violation of due process by allowing one potentially bias person to determine the violations of UNIVERSITY policy. ¶ 88 Upon information and belief, Preipke is a professional colleague of LAKE and LAKE had the burden of proof to show that JIA was responsible for the alleged conduct. Because of Pripke's conclusions in this case Preipke's objectivity as a colleague of LAKE was compromised. ¶ 89 In September 2014, Preipke, while on campus, distributed a poster titled "A call to Men, ending violence against women". Preipke's distribution of a sexist poster, which falsely assumes only men to be rapists and only women to rape victims is evidence that he was bias and discriminatory.  The poster and the event were approved by UNIVERSITY and held on the UNIVERSITY campus. ¶ 90 Statements LAKE made in December 4, 2014 in the Miami news article about the monetary impact of a negative finding from a Title IX investigation can be construed to suggest that his investigative approach and the charging of students was designed to avoid any Title IX compliance investigations, which primarily address the rights of complainants. ¶ 92 Statements LAKE made in University newspaper article, "'The hardest part of my job is taking a step back," "I find myself getting too connected to the emotions of the accused or of the victim sometimes." Can be construed to suggest that he emotionally connected to CAMERON. ¶ 93 Statements CAMERON made "LAKE was a constant source of support throughout her hearing" "Lake is one of the few people on campus who is really there for students and wants them to get better," support the earily assertion that his focus was on the rights of the complainants and not JIA.  Evidence supporting LAKE failed to properly perform his duties as an objective, impartial and unbiased University Dean and investigator during JIA's hearing with CAMERON. ¶ 94

Preipke determined that CAMERON was "more drunk" than JIA supposedly demonstrated by the fact that CAMERON vomited before they had sex. Priepke without any evidence or medical training whatsoever, came to the conclusion that CAMERON could not consent because she was "more drunk" than JIA. JIA was also drunk that night and according to the student handbook could not consent due to the fact he was drunk. The panel disregarded that fact and found JIA responsible for violations of the student handbook. JIA was treated differently because he was male. ¶ 97

Priepke made an error in finding JIA responsible for Sexual Assault/Battery (Rape) and Relationship and/or Intimate partner violence. Three witnesses (Jia, Gardell, Stein) testified at the student conduct hearing (Gardell and Stein's testimony was read into the record and confirmed by LAKE as consistent with his interviews) that it was CAMERON and not JIA who asked to have sex. JIA testified that he said no but participated after her repeated requests and her pulling him into her. CAMERON did not dispute these reports, she only questioned how she worded her requests and whether she really made statements such as "I want you to put it in me", "I want you to fuck me" or words to that effect. ¶ 99

LAKE failed to investigate any of CAMERON's past relationships, including Hunter Bihn. ¶ 101  LAKE failed to investigate any of JIA's past relationships.  In fact, LAKE failed to investigate very little of JIA's background. ¶ 102 LAKE failed to interview the police who refused to bring charges against JIA for the alleged sexual assault. ¶ 103 The preponderance of evidence clearly shows that CAMERON asked to have sex and it was JIA whose consent was requested. ¶104 UNIVERSITY policy does not contemplate or address the need for the person making the request for sex to consent. An invitation does not require the consent of the person doing the inviting. A person cannot file a complaint alleging that a person gave them what they requested. ¶ 105 UNIVERSITY policy does not address level sobriety necessary for student to ask to have sex with another student. Because CAMERON was the one seeking sexual engagement, her sobriety is not an issue. The only issue is JIA's sobriety and his ability to consent to her invitation. ¶ 106 UNIVERSITY policy does not require that both parties to sexual intercourse be sober or that both parties consent. It only requires that the person being asked to have sex consent and be able to make an intelligent, knowing, and voluntary judgment to consent. JIA was the party who needed to consent to CAMERON repeated request. In actuality, the

UNIVERSITY could have charged her under its consent policies because JIA had been drinking. ¶ 107 UNIVERSITY policies do not recognize diminished capacity due to the voluntary consumption of alcohol as a valid explanation for student's behavior. In this case CAMERON's possible diminished capacity from her voluntary use of alcohol cannot be used to excuse or justify her behavior namely soliciting sex from JIA. ¶ 108 Preipke assessment of CAMERON's sobriety is irrelevant to the facts of this case and cannot be used as a basis for his decision because as the party being asked to have sex, only JIA consent is relevant. Even if CAMERON was consuming alcohol, there was no evidence presented at the hearing that would preclude her from making an intelligent, knowing, and voluntary decision to request sex from a person with whom she had an ongoing sexual relationship. The fact that she became nauseous and vomited is insufficient to conclude she could not ask a partner for sex. ¶ 109 UNIVERSITY encountered a case where the women was the sexual aggressor and filed a complaint because her partner let her engage in sex.  There is nothing in the University Code of Student Conduct that directly address this type of situation. In such cases, administrators sometimes forced to finesse their institutional policies by reinterpreting the intent of the policy to fit the complaint. This manipulation is sometimes referred to as Policy manipulation or judicial overreach, where "judicial" refers to the student judicial system. Essentially the charges UNIVERSITY invented for JIA was "consenting to have sex with a person who was drinking." There is no policy in the University student code of conduct that prohibits that behavior.  Therefore, UNIVERSITY misclassified CAMERON as a complainant, even though it was CAMERON's actions that were the proximate cause of sexual intercourse. ¶ 115

JIA's allegations, when reviewed as a whole in the totality of the circumstances, describe how University made an erroneous finding of JIA being responsible for sexual misconduct, notwithstanding that JIA and Cameron were in consensual sexual relationship for months, and whose account directly conflicted with other witnesses account that the incident was consensual. Moreover, University applied its stated policies, procedures and gender-biased practices in a manner that discriminated against Plaintiff on the basis of his sex and led to an erroneous and adverse outcome. Specifically:

UNIVERSITY's sexual assault policies attempt to redefine rape by proposing social rules on the conditions that might not constitute consent.  Minority age, mental capacity, force restraint or unconsciousness, are valid grounds for charging students with sexual assault/battery (rape). UNIVERSITY appropriately prohibits these behaviors in their policies, but it doesn't stop there. Instead, UNIVERSITY attempts to redefine rape (and other sexual misconduct) as "consent" outside the commonly understood social norms. ¶ 116 UNIVERSITY's attempt to redefine rape (and sexual misconduct) as sex after drinking alcohol, is overly broad, nonsensical, and unenforceable in a college environment.  Rape is not synonymous with diminished capacity when consenting to sex. ¶ 117 Because university administrators believed that CAMERON was influenced to some degree by alcohol when she solicited sex from JIA, they found him responsible for her behavior. No UNIVERSITY policy addresses the sobriety level of the person requesting sex.  The UNIVERSITY policies only address the sobriety of the person giving the consent.  In this case the consenting party is JIA, not CAMERON.  Its not possible for people who ask their partners for sex can claim that they not consent to the sex they requested. ¶ 119 Upon information and belief, the UNIVERSITY has never absolved a male student of sexual misconduct because he pleaded diminished capacity. Yet, UNIVERSITY claimed that CAMERON cannot be held accountable for initiating sex because of what she reported as diminished capacity.  This double standard treats women and men differently. ¶ 120

Upon information and belief, the UNIVERSITY has never found a female student in violation of sexual misconduct for failure to obtain consent from a male who was intoxicated. ¶ 121 The decision by UNIVERSITY to define this behavior as sexual assault or rape and then find JIA responsible, shocks the conscience of a reasonable person. It is gender bias, unfair, unjust, and unsupported by the facts. ¶122 UNIVERSITY demonstrated gender bias by assuming that JIA needed to gain CAMERON's consent for sex despite evidence showing that she is one who asked to have sex.  The credibility of CAMERON's complaint and motivation was not a close call, it was strikingly obvious.  Yet UNIVERSITY immediately assumed that as a male, JIA was the person that controlled the sexual engagement. ¶ 123 For the UNIVERSITY to assume that women do not initiate sexual intercourse, cannot be the sexual aggressors

during intercourse, and that men must therefore seek the permission of women even when women initiate sex, shows unequal treatment and gender bias. ¶ 124 By infantilizing women and ignoring that both men and women can initiate and agree to sex, UNIVERSITY is treating men and women unequally.  This gender bias is evident in the UNIVERSITY's policies, the application of those policies in student conduct hearing for sexual misconduct and in the "rape culture" programs it supports. ¶ 125 WESTAWAY and CAMERON used CAMERON's false stories and other lies to target, personalize, and weaponize untrue stories about JIA.  They worked together to JIA the face of the college rapist who got way with a rape that the UNIVERSITY failed to deal with by permanently expelling him.  They used this information to highlight the dangers that males present to women at the UNIVERSITY and to attempt to pressure UNIVERSITY into not only expelling JIA, but to punish all mem more severely if accused of rape or sexual assault regardless of the facts or circumstances. ¶ 126 UNIVERSITY was aware of how JIA was being castigated by WESTAWAY and CAMERON. They knew how unfair and untrue the stories were how this information was being used to not only destroy JIA's life, but also harm the chances of men accused of sexual assault or rape, innocent or not, from having impartial adjudication of those charges and a fair outcome.  Nevertheless, UNIVERSITY stood by and took no action to correct these injustices.  They allowed the mischaracterization of JIA that fed the narrative that males are sexual predators. ¶ 127

Based on the foregoing, JIA has adequately pleaded facts demonstrating how JIA was discriminated against on the basis of his gender.  A fair reading of the evidence reveals the complaint lacked any corroboration or reliability. JIA has also demonstrated how University's investigation process was influenced by both internal and external pressures to handle sexual misconduct complaints more aggressively.  Given what is actually alleged, JIA has presented a plausible claim for a violation of Title IX.

III.    **JIA Sufficiently Pleads Defamation, Intentional Infliction of emotional distress and Invasion of Privacy against University by Respondeat Superior.**

### A.  Respondeat Superior

Defendant adopts and incorporates by reference Westaway's Motion to Dismiss, thus Plaintiff adopts and incorporates by reference its Response to Westaway' Motion to Dismiss and will argue in more detail the elements  of the above referenced cause of actions in that Response.

Defendant argues that for the University to be liable for the conduct of its employee (Westaway) Plaintiff must allege sufficient facts to show that (1) the conduct was the kind the employee  was employed to perform; (2) the conduct occurred during the working hours and at the employee's location; and  (3) the conduct was activated at least in part by a desire to serve the employer. *See Ayers v. Wal-Mart Stores, Inc.*, 941 F. Supp. 1163, 1168 (M.D. Fla. 1996) (A case decided on Summary Judgment not a Motion to Dismiss) The Court in *Sparks*, engages in a succinct analysis of Respondeat Superior in the context of Title VII and the *Byrd* opinion which the Court in Ayers rely upon. *Sparks v. Jay's A.C. & Refrigeration*, 971 F. Supp. 1433, (M.D. 1997); *Byrd v. Richardson-Greenshields Secur., Inc.*, 552 So. 2d 1099 (Fla 1989).  The Court in Sparks concluded that the Byrd opinion does not modify the prima facie elements of respondeat superior liability for supplemental state claims arising out of sexual harassment allegations.  Florida law concerning the elements of "scope of employment" still applies. Plaintiff must allege that defendant's actions were committed in the scope of their employment.  *Sparks* at 22.  In this present case the Plaintiff alleges "At all times relevant to this Complaint, WESTAWAY, was an employee of the UNIVERSITY acting within the scope of her employment as an agent of the UNIVERSITY with the express authority of UNIVERSITY to act." ¶ 45 WESTAWAY sent letters in her official capacity, ¶12, WESTAWAY spoke out to Miami Hurricane official student paper ¶131, article was published on website of Westaway as professor of Women's Gender Studies ¶131, WESTAWAY conducted rallies on campus sanctioned by the UNIVERSITY in attempts to expel or force JIA to leave School ¶132, WESTAWAY held an event on UNIVERSITY's campus to get "Justice for Angela" ¶138 Although the battery accusations were false, CAMERON, and WESTAWAY and the other members of "Canes Consent" continued for the next few weeks to claim that JIA had hurt and beat

23

ANGELA CAMERON close to unconsciousness. ¶138 WESTAWAY repeated CAMERON's false and malicious claims, used CAMERON's false reports of being attacked by JIA as evidence of the violence men perpetrate against women, and lent her credibility as a University faculty member to the vitriolic falsehoods proffered by CAMERON.  WESTAWAY did this without regard for the veracity of CAMERON's claims.  ¶139 Despite having both actual and constructive knowledge of WESTAWAY's conduct as an employee of the University, the UNIVERSITY did nothing to stop her damaging behavior directed at one of their students, JIA. ¶140 All of these allegation specifically alleged WESTAWAY actions were committed within the scope of her employment and UNIVERSITY had actual and construction knowledge of WESTAWAY's conduct. "Her defamatory actions were done with the scope of her work at the University". ¶143

Plaintiff relies on *Casey*, a case decided on the distinguishable line of precedent dealing with vicarious liability of municipalities for their police officers' sexual assaults. *Casey v. City of Miami Beach*, 789 F. Supp. 2d 1318, 1320 (S.D. Fla. 2011).  The court in Watts, held that the Court determines whether the allegations support a plausible inference the Defendant acted in furtherance of the City's interest, even if his actions were "excessive and misguided." *Iglesia Cristiana*, 783 So. 2d at 356 (3rd DCA 2001); *see also Andersen v. United States*, No. 09-60364-CIV, 2009 U.S. Dist. LEXIS 128768, 2009 WL 6633307, at 5 (S.D. Fla. Oct. 21, 2009) (finding under the "purpose" prong, a count discerns whether there is a "relationship between the employee's wrong and employer's interests')(citing *Forster v. Red Top Sedan Serv., Inc.*, 257 So. 2d 95, 96 (Fla. 3d DCA 1972); *Columbia By The Sea, Inc., v. Petty*, 157 So. 2d 190 (Fla. 2d DCA 1963)).

The Plaintiff alleges WESTAWAY founded UNIVERSITY organization Canes Consent. She was a member of UNIVERSITY president Shalala's Coalition on Sexual Violence Prevention and Education. She taught multiple course in women's and gender studies, she was the program director of UNIVERSITY Women's Commission in 2013. She was UNIVERSITY's Women and Gender studies delegate at the women's leadership symposium in 2013.  She was the Gender Advisor during Diversity Week with UNIVERSITY's Office of Multicultural Student Affairs, in 2013 She was the Women

and Gender Studies Consultant for "CONVERGE! The Movement to End Gender Violence" with UNIVERSITY School of Law, 2014. ¶ 28 WESTAWAY was never trained by the UNIVERSITY or properly supervised, instead she was given free range to disseminate private and false information regarding JIA to his detriment.  Even after WESTAWAY discovered CAMERON was lying, WESTAWAY pursued her crusade against JIA with even more vigor. ¶ 28 On May 3, 2015, WESTAWAY with concerned faculty, sent a letter to President Shalala stating " We are calling for a renewed response from the administration to the information that has come to light about how the university is handling issues of sexual assault on campus." "A fair hearing for Angela Cameron, and assurance that there will not be fall out for any students, faculty, or staff who have supported her." "While the issue of sexual assault is seen by many university administrations as a possible PR threat, inaction is just as likely to damage a university's reputation." "Angela represents many other students who have not been able to come forward."   WESTAWAY was a catalyst of pressure on the UNIVERSITY to do something regarding CAMERON'S alleged sexual assault. ¶ 29 Upon information of belief, despite this confidentiality policy, CAMERON and WESTAWAY disclosed confidential information obtained during this hearing to further the goals to make JIA the face of the college rapist who got away with rape the UNIVERSITY failed to deal with by permanently expelling him.  JIA never consented to dissemination of his private information. ¶ 29

Even if WESTAWAY's actions were excessive and misguided, JIA's allegation support a plausible inference WESTAWAY acted in furtherance of the UNIVERSITY's interests.

### B.  Statute of Limitations, Privilege, and Falsity are Affirmative Defenses

Defendant raised the Affirmative Defenses of the Statute of Limitation, Privilege and Falsity in its third Motion to Dismiss.  Affirmative defenses are generally matters raised in an answer and not in a motion to dismiss. *Rolle v. Cold Stone Creamery, Inc.*, 212 So. 3d 1073 (Fla. 3rd DCA 2017).   Affirmative Defenses, such as statute of limitations and laches, are generally matters raised in an answer and not a motion to dismiss.  *Grove Isle Ass'n v. Grove Isle Assocs., LLLP*, 137 So. 3d 1081 (Fla. 3rd DCA

2014).  An affirmative defense that was required to be asserted in the answer, and it was not a proper basis for granting a motion to dismiss, even where the availability of the defense appeared on the face of the complaint.  *Fletcher v. Williams*, 153 So. 2d 759 (Fla. 1st DCA 1963).  Substantial truth is an affirmative defense in a defamation case. *Berman v. Kafka*, 661 Fed. Appx. 621 (Fla 11th Cir App 2006).   Qualified privilege in an affirmative defense in a defamation action. *Schreidell v. Shoter*, 500 So. 2d 228 (Fla. 3rd DCA 1986). Furthermore, where the evidence is disputed as to the existence or nonexistence of a privilege there is a mixed question of law and fact, and the fact issue is to be determined by the jury. *Hartley & Parker, Inc. v. Copeland*, 51 So.2d 789 (Fla. 1951); *see also Glickman v. Potamkin*, 454 So.2d 612 (Fla. 3d DCA 1984)(in a defamation action, the affirmative defense of truth, good motive and qualified privilege present factual questions for resolution by the jury), *review denied*, 461 So.2d 115 (Fla. 1985); *but see Myers v. Hodges*, 53 Fla. at 217, 44 So. at 364 (when the facts are uncontroverted, the court is to determine whether or not the publication is privileged).

## CONCLUSION

As set forth in the detail above, Plaintiff, David Jia's Complaint set forth facts that when taken as true, as they must be in this stage of the litigation, support each and every claim Plaintiff has pled against Defendant, UNIVERSITY and WESTAWAY. Accordingly, Plaintiff respectfully request that this court denied Defendants Third Motion to Dismiss.

Respectfully Submitted,
   /s/Lonnie B. Richardson
Lonnie B. Richardson, P.A.
Attorney for Plaintiff
Florida Bar No. 564516
690 Lincoln Road, Suite 204
Miami Beach, Florida 33139
Tel: 786-603-1323
Fax: 305-428-9539
officelonnierichardson@gmail.com

## CERTIFICATE OF SERVICE

| **Isicoff Ragatz** | **Angela Cameron, Pro se** | **Dwon Huggins, Esq.** |
|---|---|---|
| **Via CM/ECF** | **Via U.S. Mail/or e-Mail** | **Via U.S. Mail and/or e-Mail** |
| 601 Brickell Key Drive, Suite 750 | Crystal Lakes Apartments | PO BOX 821802 |
| Miami, FL 33131 | 2601 NW 207th St. | South Florida, Florida 33082 |
| 305-373-3232 | Apt #207 | dwonhuggins@yahoo.com |
| Fax: 305-373-3233 | Miami Gardens FL 33056 | *Counsel for Defendant Katherine Westaway* |
| *Counsel for the University of Miami and William Tony Lake* | angela.cameron1223@yahoo.com | |